## UNITED STATES v. GELLMAN et al.

### No. 7210.

District Court, D. Minnesota,
Fourth Division.

April 8, 1942.

charge violation of Section 278—possession and sale of counterfeit five cent coins. Counts 5 to 8 charge violation of Section 277—possession and sale of ten cent and twenty-five cent counterfeit coins. Counts 9, 10 and 11 charge violation of Section 281—passing five cent, ten cent and twenty-five cent coins intended for the use and purpose of current money. Counts 12 to 14 charge violation of Section 282—passing devices in metal intended to be used as money for five, ten and twenty-five cent pieces. It may be observed that Count 13 refers to ten cent pieces and Count 14 to twenty-five cent pieces. This statute, Section 282, refers only to one cent, two cent, three cent, and five cent pieces. However, in view of the disposition of the charges, the applicability of this statute to coins of the denominations referred to need not be discussed.

The defendants Gellman conduct a wholesale and retail business in Minneapolis, selling amusement and concession merchandise, and among the merchandise handled and sold are tokens and trade checks which were largely purchased from Wilcox Manufacturing Co., of Chicago, Illinois whose business is the manufacture and sale of hospital and hotel supplies and stampings of various types and descriptions. The defendant Voorhees is an officer of the Wilcox Co. These trade checks, or slugs, as they are sometimes called, which form the basis for the charges herein, are in the size and shape of genuine United States five cent, ten cent and twenty-five cent coins. While there is some variance in the metallic contents, and in the weight and diameter of the five cent slugs, the type bearing the closest resemblance to a genuine United States coin was identified as Government's Exhibit A, and this coin may be compared with a genuine five cent coin as follows:

Victor E. Anderson, U. S. Atty., and John W. Graff, Asst. U. S. Atty., both of St. Paul, Minn., for plaintiff.

T. W. McMeekin, of St. Paul, Minn., and Maurice Weinstein, of Milwaukee, Wis., for defendants.

NORDBYE, District Judge.

There are fourteen counts in the indictment. The two Gellmans are charged with being principals and the defendants Wilcox Co. and Voorhees with aiding and abetting. The first four counts

| Description and Contents | Genuine 5 cent coin | 5 cent slug-A |
|---|---|---|
| Weight (grains) | 77.16 | 76.30 |
| Diameter (inches) | 00.835 | 00.835 |
| Thickness (inches) | 00.078 | 00.075 |
| Copper (%) | 75.00 | 64.88 |
| Nickel (%) | 25.00 | 17.56 |
| Zinc (%) | 00.00 | 15.21 |
| Cadmium (%) | 00.00 | 02.05 |
| Iron (%) | 00.00 | 00.16 |

The ten cent slug, in comparison with a genuine ten cent coin, is as follows:

| Description and Contents | Genuine 10 cent coin | 10 cent slug |
|---|---|---|
| Weight (grains) | 38.58 | 35.2 |
| Diameter (inches) | 00.705 | .709 |
| Thickness (inches) | 00.051 | .051 |
| Copper (%) | 10.00 | 63.65 |
| Silver (%) | 90.00 | 00.00 |
| Nickel (%) | 00.00 | 16.91 |
| Zinc (%) | 00.00 | 19.05 |

The twenty-five cent slug may be compared with a genuine twenty-five cent coin as follows:

| Description and Contents | Genuine 25 cent coin | 25 cent slug |
|---|---|---|
| Weight (grains) | 96.45 | 78.70 |
| Diameter (inches) | 00.955 | 00.951 |
| Thickness (inches) | .065 | 00.065 |
| Copper (%) | 10.00 | 66.95 |
| Silver (%) | 90.00 | 00.00 |
| Nickel (%) | 00.00 | Trace |
| Zinc (%) | 00.00 | 32.78 |

The inscriptions on the three types of slugs vary. On some of the five and ten cent slugs there is inscribed "Good for Amusement Only," and on the other side, "This Token has no Cash or Trade Value." On either side of the five cent slug of this type is inscribed the numeral 5, which is placed within a diamond-shaped enclosure. The ten cent coin is inscribed with the same inscription, but has the numeral 10 instead of the numeral 5. The other specimens of five cent and twenty-five cent slugs are inscribed "No Cash Value" and on the reverse side, "Good for Amusement Only." No numbers or numerals appear on these slugs. All of these tokens and slugs are made of German silver and are blanked out of regular commercial German silver metal sheets. The Wilcox Co. obtains these metal sheets in the market and manufactures the tokens or slugs as above stated.

There is no contention on the part of the Government that any of these tokens were ever palmed off on any person as genuine United States coins. The resemblance or similitude required by the statute is sought to be established on the theory that these tokens will operate certain vending machines, music boxes, cigarette machines, telephone pay-station boxes, parking meters, and other types of machines which are adapted for use or service by the insertion of certain genuine United States coins.

Sections 277 and 278, T 18 U.S.C.A., read as follows:

"§ 277. Counterfeiting gold or silver coins or bars. Whoever shall falsely make, forge, or counterfeit, or cause or procure to be falsely made, forged, or counterfeited, or shall willingly aid or assist in falsely making, forging, or counterfeiting any coin or bars in resemblance or similitude of the gold or silver coins or bars which have been, or hereafter may be, coined or stamped at the mints and assay offices of the United States, or in resemblance or similitude of any foreign gold or silver coin which by law is, or hereafter may be, current in the United States, or are in actual use and circulation as money within the United States; or whoever shall pass, utter, publish, or sell, or attempt to pass, utter, publish, or sell, or bring into the United States or any place subject to the jurisdiction thereof, from any foreign place, knowing the same to be false, forged, or counterfeit, with intent to defraud any body politic or corporate, or any person or persons whomsoever, or shall have in his possession any such false, forged, or counterfeited coin or bars, knowing the same to be false, forged, or counterfeited, with intent to defraud any body politic or corporate, or any person or persons whomsoever, shall be fined not more than $5,000 and imprisoned not more than ten years."

"§ 278. Counterfeiting minor coins. Whoever shall falsely make, forge, or counterfeit, or cause or procure to be falsely made, forged, or counterfeited, or shall willingly aid or assist in falsely making, forging, or counterfeiting any coin in the resemblance or similitude of any of the minor coins which have been, or hereafter may be, coined at the mints of the United States; or whoever shall pass, utter, publish, or sell, or bring into the United States or any place subject to the jurisdiction thereof, from any foreign place, or have in his possession any such false, forged, or counterfeited coin, with intent to defraud any person whomsoever, shall be fined not more than $1,000 and imprisoned not more than three years."

It will be observed that both of these statutes require that the coin, to be counterfeit, must be in the resemblance

or similitude of a genuine United States coin. The slugs or tokens in question are all similar as to weight, diameter and thickness. The five cent coin, Exhibit A, is similar in metallic composition, but manifestly the resemblance of any of the alleged counterfeit coins is not such that these tokens would deceive any person exercising ordinary caution, nor would they deceive "an honest, sensible, and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest." United States v. Weber, D.C.W.D.Wash.N.D., 210 F. 973, 976. In fact, any school child, or the most illiterate person, would not be duped into accepting any of these slugs or tokens as genuine coins. There are no inscriptions or markings on the face of the coins which even remotely resemble or simulate that which appears on the genuine coins of the denominations referred to. While courts have differed in some degree as to the test which should be applied in determining resemblance or similitude, no court has departed from the test which seeks to determine the possibility or probability of some person being deceived by the passing of the spurious coin. Here, the Government seeks to establish similitude or resemblance because certain vending machines will respond to these metal tokens. A completely blank slug, composed entirely of iron, or even a certain wire device, might deceive some vending machines, but no one would have the temerity to suggest that such a metal device would be a counterfeit coin within the purview of the statutes referred to. True, there is some resemblance between a blank metal disk the size of a five cent piece and a genuine five cent coin. They are both made of metal. The weight and diameter may be approximately the same, but if we are to apply the test which has been universally applied by the courts for almost a century, it follows that the position of the Government in this regard is not tenable. Reference to the cases will indicate that throughout the courts have determined that, while a counterfeit coin need not be an exact copy, it must be one "as might deceive an ordinary observer." United States v. Aylward, D.C.Conn.1853, 24 Fed.Cas. 907, No. 14,482.

"One of the rules applicable to the offence of counterfeiting is, that the resemblance of the spurious to the genuine coin must be such as that it might deceive a person using ordinary caution." United States v. Bogart, D.C.N.Y.1878, 24 Fed.Cas. 1185, No. 14,617.

"* * * The jury was charged that no conviction could be had unless the coins put in evidence were found to bear such a resemblance to the genuine trade dollar as to render them capable of being used to deceive a person of ordinary intelligence * * *. The charge was correct." United States v. Abrams, C.C. S.D.N.Y., 18 F. 823, 824.

"* * * It is not necessary that the resemblance should be exact in all respects. The resemblance is sufficient if the coins are so far alike that the counterfeit coin is calculated to deceive a person exercising ordinary caution and observation in the usual transactions of business." United States v. Hopkins, D. C.N.C.1885, 26 F. 443.

"If the imitation or resemblance is such as is capable of imposing on persons of ordinary observation, this would be sufficient; and it is further sufficient if the alleged counterfeit coin bears such resemblance or likeness to the genuine as to be calculated to deceive an honest, sensible and unsuspecting man of ordinary observation and care, dealing with men supposed to be honest." Glass v. State, 45 Tex.Cr.R. 605, 78 S.W. 1068, 1069, 108 Am.St.Rep. 980.

No substantial departure will be found in any reported decision from the interpretations above enumerated. It would seem that the mere fact that these tokens are, by reason of this modern mechanical vending age, capable of use for purposes designed primarily for genuine coins, should not justify the substitution of the "mechanical test" for the discrimination in accepting proffered coins commonly and usually employed by average, prudent persons. There would be no justification for such a strained and unwarranted interpretation of a criminal statute which clearly was not designed to prohibit the manufacture and sale of any metal pieces in the size of a genuine United States coin, unless they bore such resemblance or similitude to genuine coins that they would be likely to deceive some person into accepting them as genuine. The machine test suggested by the Government is not encompassed within the plain purview of the statutes referred to,

and it follows that these defendants are not guilty of the possession and sale of coins bearing any similitude or resemblance to genuine United States coins. In view of this finding, it does not become necessary to discuss the other element of the statutes, to wit, an intention to defraud.

It is urged, however, that these coins do come within the purview of the prohibition found in Sections 281 and 282, 18 U.S.C.A. These statutes read as follows:

"§ 281. Making or uttering coins resembling money. Whoever, except as authorized by law, shall make or cause to be made, or shall utter or pass, or attempt to utter or pass, any coins of gold or silver or other metal, or alloys of metals, intended for the use and purpose of current money, whether in the resemblance of coins of the United States or of foreign countries, or of original design, shall be fined not more than $3,000, or imprisoned not more than five years, or both."

"§ 282. Making or uttering devices of minor coins. Whoever, not lawfully authorized, shall make, issue, or pass, or cause to be made, issued, or passed, any coin, card, token, or device in metal, or its compounds, which may be intended to be used as money for any 1-cent, 2-cent, 3-cent, or 5-cent piece, now or hereafter authorized by law, or for coins of equal value, shall be fined not more than $1,000 and imprisoned not more than five years."

A reading of these sections induces the view that they were primarily adopted to prevent the coining of money in competition with the United States; resemblance or similitude is not necessarily an element. The United States has the sole power to coin money under the Constitution, and if anyone, individual or State, assumes to supplant the medium of exchange adopted by our Government, or assumes to compete with the United States Government in this regard, a violation of these statutes would follow. Undoubtedly, no one can interfere with the monopoly which this Government has obtained by reason of the Constitutional provisions without running afoul of these statutes. If one manufactures a coin, a five cent piece, for instance, in an oblong shape, and although much larger than a genuine five cent piece, for the purpose of circulation as money within any area of the United States, a violation would occur. But the intendment must be that the coin shall be "for the use and purpose of current money" under Section 281, and "to be used as money" under Section 282. Now, money is a medium of exchange. It is something which has general exchangeability as such. Obviously, these tokens or slugs were never intended for circulation as money. The very inscriptions—"No Cash Value"—"For Amusement Purposes Only"—dispel any doubt in that regard. There is no promise to pay money or anything of value, either impliedly or by reason of any express inscription on the coin.

In United States v. Roussopulous, D.C. Minn., 95 F. 977, 978, where the court considered certain trade checks with the name "Clark & Boice Lumber Co., 1898, Jefferson Texas," and on the other side, "Good for 50c in Merchandise," Judge Lochren used language as follows:

" * * * It does not purport to be a piece of money, or an obligation to pay money, and the obligation expressed is in terms solvable in merchandise. It cannot, therefore, have been intended to circulate as money, or to be received and used in lieu of lawful money, and does not come within the prohibition of section 3583, Rev. St.U.S." 18 U.S.C.A. § 293.

The Government contends, however, that, because these tokens are used in place of money in various types of vending machines, and because the defendants knew that they could be used for such purpose, the tokens or slugs were actually used in place of money, and that therefore a violation of the statute occurs. In this regard, it may be stated that the defendants contend that they assumed that the tokens were primarily used by amusement and vending machine operators to stimulate business. The evidence fairly supports the contention that many concerns purchase these tokens for such purposes. On the other hand, however, there cannot be much doubt that all of the defendants knew of the probability of the use of such tokens by persons who defraud the owners of such machines. Gellman Bros. sold these tokens in quantities of one hundred to anyone who might desire to make the purchase, and no attempt was made by them to determine the purposes for which the tokens were obtained. That owners of vending machines, telephone pay stations and parking meters in this area are defrauded of thousands of

dollars every year by the use of tokens or slugs similar to these here involved has been clearly established by the evidence. Furthermore, that these tokens could be used in place of money in operating vending machines is conceded. The menace and the monetary loss to legitimate enterprises by reason of the manufacture and sale of such tokens is apparent. However, notwithstanding the fraud that has arisen by reason of the manufacture, sale and circulation of slugs similar to those which form the basis of this indictment, it must be recognized that many tokens or slugs have a so-called legitimate connection with certain types of amusement machines. For instance, the ordinances of the City of Minneapolis, passed October 25, 1935, and the City of St. Paul, passed September 11, 1941, assume to permit the licensing of mechanical amusement devices operated by coins or slugs which return to the player slugs or tokens similar to those herein identified, when such slugs or tokens are used in the machines so licensed. That is, the ordinances were apparently enacted to permit machine operators to enable the users of such machines to obtain as prizes the right to replay the same by receiving and using slugs or tokens in the event certain scores or results were obtained by such users. Furthermore, it does appear that certain operators of amusement machines have purchased tokens from time to time from these defendants for the purpose of demonstrating their machines and to stimulate business. Then, again, there are instances where these slugs are purchased for legitimate purposes by concerns or individuals who, by courtesy, permit their employees or others to operate certain amusement or vending machines and who do not, therefore, desire to distribute genuine coins for such purposes. While this Court is not unmindful of the menace and nuisance which has arisen by reason of the indiscriminate manufacture and sale of such tokens or slugs, it would seem that the mere adaptability of such tokens for use in the place of genuine coins in the operation of these machines, whether with or absent consent of the owner, does not justify a finding that these tokens are manufactured or sold by these defendants for the use or purpose of current money, or as a medium of exchange.

In United States v. Van Auken, 96 U.S. 366, 367, 24 L.Ed. 852, the Supreme Court considered the Act of Congress of July 17, 1862, § 2, 12 Stat. 592; Rev.Stat. p. 711,

§ 3583, 18 U.S.C.A. § 293, which declares that "no private corporation, banking association, firm, or individual shall make, issue, circulate, or pay out any note, check, memorandum, token, or other obligation, for a less sum than one dollar, intended to circulate as money, or to be received or used in lieu of lawful money of the United States." The defendant was indicted under this Act for circulating an obligation which read as follows: "Bangor, Mich., Aug. 15, 1874. The Bangor Furnace Company will pay the bearer, on demand, fifty cents, in goods, at their store, in Bangor, Mich." This obligation was signed by the president and the treasurer. A demurrer was interposed to the indictment and was sustained, the court stating with reference to the statute under which the indictment was brought (96 U.S. page 368, 24 L.Ed. 852):

"It is certainly inapplicable to any thing not measurable by the pecuniary standard. It could not be applied where the measurement was to be, ex gratia, by the pound, the gallon, the yard, or any other standard than money."

And, further: " * * * It is not payable in money, but in goods, and in goods only. No money could be demanded upon it. It is not solvable in that medium."

■ Funk & Wagnall's Dictionary defines "money" in part as follows: "Any material that by agreement serves as a common medium of exchange and measure of value in trade." It quotes from J. M. Gregory's Political Economy, p. 253, wherein the author states that the "essential, natural functions of money may be stated as including these three: 1. It is a commodity —having a value of its own. 2. It is a common measure of values. 3. It has general exchangeability, and is, hence, a general medium of exchange." While historically speaking, and in a comprehensive sense, many commodities have been used as a medium of exchange, one cannot reconcile the adaptability of certain metal devices in operating mechanical machines in place of money as fulfilling the requirements of a medium of exchange, as that term is commonly and generally understood. The difficulty is that this indictment seeks to charge the defendants with an offense under statutes which were enacted over one hundred years ago when vending machines probably did not exist. They were never framed to embrace the use of metal tokens as a substitution for money in the limited sense

referred to. While the Court is not unmindful that there should be some curb on the fraud that is being perpetrated by the use of these slugs or tokens, relief must be sought from Congress and not from the courts. The State of Minnesota has recently passed an act, Chapter 132, House File No. 270, approved April 9, 1941, which prohibits the manufacture, sale, offering for sale, advertising for sale, or distribution of tokens, checks or slugs for use in lieu of lawful coin in vending machines, parking meters, service meters, coin boxes, telephones or other coin receptacles. No doubt Congress would have authority to extend the statutory prohibitions regarding the use of coins or tokens in the manner referred to herein. A criminal statute must be strictly construed, and to apply these statutes to the factual situation disclosed by this evidence would be entirely unwarranted.

Therefore, in harmony with the views herein indicated, it follows that the defendants and each of them are not guilty of any of the counts set forth in the indictment. It is so ordered.